**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
v.                             )      Case No. 16-20069-CM
                               )
CHARLES MADER, et al.          )
                               )
                Defendants.    )

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
<u>DUE TO PREINDICTMENT DELAY</u>**

COMES NOW the Defendant, Charles Mader, by his attorney, and respectfully submits the following memorandum in support of his Motion to Dismiss for Preindictment Delay.

**I.   Factual Background**

**A. Razorback Rail Services Contract with KCT**

1.   In November 2006, John Bell executed Articles of Incorporation for Razorback Rail Services, Inc. ("RRS"), as its President.   RRS was created to perform railroad contracting services.   Bell provided startup capital for RRS, with the understanding that other owners in the company, including Patrick Steere and Ed McIntosh, would manage the company and run it on a day-to-day basis.

2.   One of the principals in RRS, Patrick Steere, had relationships with various well-placed executives in the railroad industry – including Bill Somervell at the Kansas City Terminal Railway ("KCT").   Steere he believed that he could capitalize on

1

those relationships in procuring contract work for RRS.   Steere was also friends with Charles Mader, who at the time was employed by TransSystems, which provided engineering consulting to KCT.

3.   Initially, Bell, Steere and McIntosh, in consideration of Mader providing contacts with possible clients, agreed that Mader would have a thirty percent interest in RRS (Interview of Ed McIntosh conducted March 7, 2012, Interviews 000371-000373, attached hereto as Ex. A), which was reflected in the internal books and records of RRS.   (KCT_PROD_000135, attached hereto as Ex. B).   However, Mader's ownership interest was never formalized in the Operating Agreement of RRS.

4.   At around the time of its formation, RRS received a bid package from KCT, so that it could provide a bid on a service contract with KCT. The bid package contained a detailed portfolio of all the documents needed to take part in the invitation to bid, including all comparative rights and obligations of the putative service contractor and the KCT.   Concerning debris and waste materials discovered or produced while performing services under the service contract, the bid package specifically stated:

> During the daily performance of the work under this contract, and upon termination or completion thereof, Contractor shall daily remove all debris and waste material resultant of his operations and maintain the site of work in a condition satisfactory to the Company. Upon completion of any integral part of the work, all surplus materials, temporary construction or structures and debris shall be removed and the premises put into a neat and orderly condition satisfactory to the Engineer…

2

> No special payment will be made for the removal of debris and cleaning up, but the cost thereof shall be included in other items for which direct payments are made… <u>All material generated by the demolition bid items shall become the property of the Contractor, and shall be properly and legally disposed of.</u> Provide for the disposal of all waste products, trash, debris, etc. and make necessary arrangement for legal disposal off of the site.

(KCT_001-1695, Attached hereto as Ex. C) (emphasis added).  The contract did not require KCT to provide a certified letter to RRS to dispose of such materials.

5.   On November 9, 2006, Bell executed a general services contract (the "KCT Contract") with KCT on behalf of RRS, as its President.  (KCT_001-1672 – KCT_001-1683, attached hereto as Ex. D).  William Somervell signed on behalf of KCT, as its President.  The KCT Contract specifically provided:

> <u>The Contractor shall,</u> as directed by the Engineer, <u>remove from the KCT's property</u> and from any public property, without expense to the KCT, <u>all temporary structures, rubbish and waste materials resulting from the contract operations</u> and shall remove from KCT Property all equipment, tools, materials and supplies not needed whenever directed by the Engineer…

(KCT_001-1680).  The contract also contains language expressly incorporating all parts of the bid package, including the language cited in paragraph 4 above, as the "Contract Documents." (KCT_001-1672).

6.   After Bell and Somervell executed the KCT Contract, RRS began performing general services work for KCT, including services to clean up an area comprising approximately five miles of long-

unused and dilapidated railroad track called the "Blue Valley Industrial Lead" ("Blue Valley Line"). The Blue Valley Line had been out of service for years, and there were trees and other vegetation growing up out of the tracks. None of the rail installed in the Blue Valley Line was reusable, because it was 70-lb rail, which had become obsolete by modern engineering standards. (The modern standard is 119-lb rail, with most main lines using between 136 and 142-lb rail.)

7.    During the early years of RRS, Bell, McIntosh, and Steere took distributions from RRS in the form of direct payments, and in some cases, by running personal expenses through the company. Bell, McIntosh and Steere agreed that Mader, as an unofficial 30% owner in RRS, could take in-kind distributions in the form of either reduced-cost or no-cost labor from RRS employees and materials on his personal properties, in lieu of monetary compensation.

8.    In approximately 2009, Bell had a significant falling-out with McIntosh, concerning a wholly separate investment property called Wolf Creek Marketplace, Inc. ("Wolf Creek"), in which they were partners. Bell and McIntosh ended up in protracted litigation with a third party and each other over this investment. Specifically, Bell claimed that McIntosh had been negligent in his business dealings with Bell, and that McIntosh had breached his fiduciary duty and duty of loyalty to Bell by "taking funds from

4

the operation of [Wolf Creek] to use for [his] own personal benefit."

9.    At the same time, Bell demanded to take a more active role in RRS, to inspect RRS's books and records, and to take over the accounting functions for RRS.   Bell did so because of his distrust for McIntosh, stemming from their failed partnership in Wolf Creek.

10.  Ultimately, Bell settled the third-party litigation involving his personal guarantees on the Wolf Creek investment for a substantial sum of money.   Bell then trained his focus solely on McIntosh and RRS.

**B. Initial Government Investigation and KCT Lawsuits.**

11.  On February 4, 2011, Bell provided information to agents of the Kansas Bureau of Investigation concerning what he claimed to be illegal activity at RRS.   Bell reported to the KBI, among other things, his belief that employees of RRS were removing scrap rail material from property belonging to the KCT.   Bell alleged that RRS employees were taking the scrap without KCT approval, selling it to various scrap yards (including Midwest Scrap Management, Inc.), and then distributing the cash to other owners of RRS and Defendant Charles "Chuck" Mader, who by then had become President of KCT.   Bell made this allegation, despite having himself signed the general services contract on behalf of RRS, which stated that "[a]ll material generated by the demolition bid

terms <u>shall become the property of the Contractor</u>, and shall be properly and legally disposed of," (KCT_001_1695), and that "the Contractor shall, as directed by the Engineer, remove from the KCT's property, without expense to the KCT, all … rubbish and waste materials resulting from the contract operations…" (KCT_001_1567).

12. Over the next year, based upon Bell's assertions, agents of the KBI and IRS orchestrated an investigation and undercover infiltration of RRS.  This investigation began by a coordinated effort among Mickey Rantz of the KBI and Bell to record a series of meetings with Mader, on March 11, 2011; March 17, 2011; March 24, 2011; April 5, 2011, and May 7, 2011.

13. During the first recorded conversation, on March 11, 2011, Bell begged Mader to help him financially, to "get [Bell] out of debt" and "financial ruin."  Mader asked Bell at the first recorded meeting "[w]hat kind of help do you need?"  Bell replied that others affiliated with RRS were "selling scrap getting $90,000… Eddie [McIntosh] was doing it… Why can't I get part of it?"  Bell then stated that he had "put a stop to it before," and that he was sorry he had to, "but now I need help."  Bell went on to say that "guys are running loose selling scrap, pocketing the money and there is nothing I can do about it."

14. Mader replied that "I was not doing anything illegal."  Because Mader believed that money he received from RRS was payment for his 30% ownership interest in RRS, Mader explained that the

6

scrap was used to pay the "$250,000 bill on a rail car" owned jointly by Somervell, Mader, and Rick Webb of WATCO, to be used for KCT events. When Bell asked whether "they are still doing the scrap stuff," Mader replied "No." Bell continued to beg, saying "I need help, I'm scared to death." After Bell described, for several minutes, all his financial difficulties involving debts, a potential bankruptcy, and attorney's fees, Mader replied "[n]ot a lot of scrap out there but I'll see what I can do."

15. In late June 2011, agents of the KBI and the United States Secret Service met with Assistant United States Attorneys Jabari Wamble and Scott Rask to brief them about their investigation to date. Rask stated that he would be interested in prosecuting this case, and in seizing any proceeds or assets gained from any illegal activity. Rask also gave an authorization for KBI Agent Mickey Rantz to work in an undercover capacity, by posing as a potential buyer of RRS. (USSS 000060, attached hereto as Ex. E). Agent Rantz did so for the next seven to eight months, recording many meetings with RRS ownership and employees.

16. This investigation ultimately resulted in the execution of search warrants at RRS and Midwest Scrap on February 1, 2012, and February 2, 2012. SA Henry Herron submitted a detailed affidavit in support of the search warrants, describing over many pages evidence which, in his opinion, showed a "scheme to defraud involv[ing] an agreement between at least two individuals" to

commit various offenses, including transportation of stolen goods across state lines in violation of 18 U.S.C. § 2314, mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and money laundering and monetary transactions in violation of 18 U.S.C. §§ 1956 and 1957. (Reports 002616 – 002641, attached hereto as Ex. F). The affidavit specifically alleges that Mader and others participated in a scheme to remove and sell scrap without authorization from KCT property, and to make improvements to Mader's properties which was billed to KCT. (*Id.*)

17. During the execution of those warrants, many employees of RRS were separately interviewed by agents of the KBI, IRS and Secret Service.

18. On the day the search warrant was executed, Kathleen Fisher, an attorney with the private law firm of Graves, Bartle Marcus and Garrett, who represented KCT, was present at the scene representing the interests of KCT and collecting information.

19. In the weeks and months that followed the law enforcement raids on RRS and Midwest Scrap's businesses, agents of the KBI and IRS conducted interviews of many former RRS employees, including Thomas Ault (interviewed on February 10, 2012), and Chad Janeczko (interviewed on February 15, 2012), who are now named as Mader's codefendants in this case. During their interviews, Ault and Janeczko directly inculpate themselves and Mader in receiving cash from sales of scrap metal removed from KCT property. Neither Ault

nor Janeczko were privy to the terms of the KCT's contract with RRS, which required RRS to remove all of waste, rubbish, and debris from KCT's property, at no cost to KCT.

20.   Separately, in the wake of the search warrants, counsel and auditors for KCT conducted their own interviews of Ault (interviewed on July 17th and July 19th, 2012), Janeczko (interviewed on February 8, 2012), and other former managers and employees of RRS, for use in their prosecution of lawsuits against RRS, and against Mr. Mader, individually.   KCT later filed suit directly against RRS in the United States District Court for the Western District of Missouri, and against Mader individually (among others) in Jackson County, Missouri, for damages arising out of the alleged scrap metal scheme.

## C. Civil Discovery, and Broadening of Investigation by Government.

21.   On April 4th and 5th, 2012, KCT filed suit directly against RRS in the United States District Court for the Western District of Missouri, and against Mader individually (among others) in Jackson County, Missouri, for damages arising out of the alleged scrap metal scheme.

22.   In early 2013 – after many months of "work[ing] jointly and cooperatively with the United States Attorney's office for the District of Kansas" to agree on a protective order (Doc. 38, Case 4:12-cv-00396-ODS, attached hereto as Ex. G) – the Government

supplied KCT's attorneys with copies of the documents it had seized from RRS, which KCT's attorneys then used in its pleadings and during discovery in the civil cases filed against RRS, Mader and others. (6/5/2013 Deposition of John Bell, p. 178, ln. 10-20, excerpts attached hereto as Ex. H).

23. On June 5, 2013, Bell was deposed in the case entitled *Kansas City Terminal Railway Company v. Razorback Rail Services, Inc.*, Case No. 12-CV-00396-ODS, filed in the United States District Court for the Western District of Missouri. Mader was not a party to this action, and as such, he did not have counsel present on his behalf to ask questions of Bell which could have been used in Mader's defense of the charges of the indictment in the case at bar. During this deposition, counsel for KCT used documents supplied by the Government to ask Bell about the scrap metal sold by RRS to Midwest Scrap Management, Inc. Counsel for KCT also asked Bell to describe his many contacts with Mader. Again, neither Mader nor his counsel were present to cross-examine Bell.

24. At his deposition, Bell testified, despite his earlier agreement with Mader, that Mader never had any kind of ownership interest in Razorback, and was never offered a partnership opportunity in Razorback. (June 5, 2013 Deposition of John Bell, p. 17, ln. 11-16, attached hereto as Ex. H). Bell admitted that Mader had received distributions from Razorback, but claimed that

he wasn't aware of that fact until he "took over the books in May 2009." (*Id.* at p. 17, ln. 17-23).

25.  Bell was then confronted by counsel for KCT with an email dated January 16, 2009, addressed to him from Mader, asking for approval for a distribution from Razorback.  Bell claimed to have no memory of it. (*Id.* at p. 20, ln. 2-25). Counsel for KCT also showed Bell a financial report from RRS ("Audit Trail") showing distributions to "CM01," referring to an account for Charles Mader distributions.  (*Id.* at p. 18).  These accounting entries appear to show costs for labor and building materials charged as distributions to Charles Mader, which directly contradicted Bell's testimony that Mader never had any kind of ownership interest in RRS.  (*Id.* at p. 18, Ex. 1).  Bell's testimony on this issue is also directly contravened by statements of Ed McIntosh given in his interview to KCT's counsel on March 7, 2012, confirming that all parties agreed that Mader would be a thirty percent owner in RRS at its inception.  (Interviews 000371-000373, attached hereto as Ex. A).

26.  Bell was also asked whether, during his recorded conversations with Mader concerning KCT scrap rail, Mader had "acknowledge[d] that Razorback had stolen KCT Scrap in the past." (June 5, 2013 Deposition of John Bell, p. 26, ln. 16 through p. 27, ln. 11, attached hereto as Ex. H).  Bell lied, saying "[h]e said, if I recall, he said I thought I knew about all of it, and

I said no, I didn't, but now I want part of it." (*Id.* at p. 9-11).

27.  Finally, when asked "who would have been directing [RRS employees] as to what [KCT] task order to report their time under when they were actually doing work for Mr. Mader," Bell testified that it would have been "Pat [Steere], Chad Janeczko, or Justin [Drescher]." (*Id.* at 111, ln. 3-19).  Bell did not implicate Mader in the task order billing scheme in this testimony, nor could he, since Mader had no access to RRS accounts, books, or billings.

28.  Bell was also confronted during his deposition with the undisputed fact that he had written a check to Tallgrass Railcar – the LLC which owned the railcar for which much of the proceeds of sale of rail scrap from RRS had been used for renovations – in the amount of $20,000, in 2009.  (*Id.* at pp. 130-132).  Bell gave very evasive testimony concerning this payment, saying that he didn't know what it was for, "unless I was investing. I have to look. I have to go back and look." (*Id.* at p. 131). Again, neither Mader nor his counsel was present at this deposition, and had no opportunity to cross-examine, flesh out, or impeach Bell's testimony.

29.  Two days later, on June 7, 2013 – and more than a year after Mader had been terminated by KCT – SA Henry Herron of IRS-CID informed the prosecution team in this case that he had been in contact with an informant who told him that Midwest Scrap

Management, Inc. ("Midwest Scrap") "is continuing the practice of receiving and purchasing rail road scrap without an authorization letter from the rail road company." (USSS 000021, attached hereto as Ex. E). Herron suggested a meeting of the prosecution team to discuss conducting an undercover operation inside of Midwest Scrap to address any "ongoing rail scrapping scheme." (*Id.*)

30.   On June 11, 2013, the prosecution team met, and discussed the possibility of conducting an undercover operation at Midwest Scrap.   It was suggested that stronger information should be gathered, such as information comparing the price Midwest Scrap was paying for alleged stolen scrap rail versus the price Midwest Scrap pays normally for scrap rail. (USSS 000022, attached hereto as Ex. E).   SA Herron stated that he would meet again with his informant, and the prosecution team decided to meet again later following SA Herron's interview to discuss again the "feasibility and cost to benefit of conducting an undercover operation on Midwest Scrap." (*Id.*).

31.   On July 30, 2013, members of the prosecution team (including SA Herron and SA Rantz) met with Kathleen Fisher, counsel for the KCT, to discuss spreadsheets she had created "detailing the loss Kansas City Terminal has suffered over the course of approximately four years due to an ongoing scheme being conducted by Charles Mader and several employees of Razorback against KCT." (USSS 000018-000019, attached hereto as Ex. E).

Ms. Fisher provided copies of the spreadsheets to the prosecution team, and described her total calculation of the loss to be $2,406,040.26. (*Id.*). These calculations appear to assume that all scrap sales by RRS involved scrap recovered from KCT, and did not account for scrap RRS recovered pursuant to its contracts with Kansas City Southern, Union Pacific, and other contracts containing language identical to the language of the KCT contracts making waste and debris materials the property of RRS.

32.   On November 11, 2013, AUSA Scott Rask communicated to the prosecution team that KCT "is currently involved in filing a civil suit against Charles Mader for losses to their company attributed to Mader as a result of the rail scrap scheme," and stated that an "indictment request is being drafted in this case for Charles Mader."   (USSS 000015, attached hereto as Ex. E).

33.   A day later, on November 12, 2013, SA Herron advised the prosecution team that "he would be presenting this case to the Grand Jury in the judicial district of Kansas next month." (USSS 000012, attached hereto as Ex. E).

34.   In February 2014, counsel for KCT deposed several employees of Midwest Scrap, taking testimony about Midwest Scrap's many purchases of scrap rail material from employees of RRS. Transcripts of these depositions of key Midwest Scrap employees taken by counsel for KCT in February 2014, were obtained by the prosecution team and placed in its discovery file. (Deposition of

Kenneth Burgess, IRS_000001 – IRS_000036; Deposition of Nicholas Hayes, IRS_000042 – IRS_000070; Deposition of Letticia Hennon; IRS_000071 – IRS_000102).

35.   In April 2014, the prosecution team reported that "no suspects in this case have had grand jury hearings," despite the earlier assertions that the team was preparing an indictment request for Charles Mader, and that the case was to be presented to the grand jury in December 2013. (USSS 000009, attached hereto as Ex. E).

36.   At roughly the same time, in early May 2014, Mader and his counsel were actively involved in settlement discussions with KCT and its counsel, with the help of a mediator, Charles Atwell. Upon information and belief, counsel for KCT expressed that "the US Attorney's office asked for some records from [KCT's] office" and that "if there is an indictment that their offer is off the table."

37.   During June and July 2014, counsel for Mader and counsel for KCT negotiated the terms of a final settlement of the civil case between them.

38.   On July 18, 2014, John Bell was again deposed, in connection with a personal injury lawsuit filed by a former RRS employee against RRS and Charles Mader, individually.  (7/18/2014

Deposition of John Bell, excerpts attached hereto as Ex. I).[1]   In this deposition, counsel for Mr. Mader asked Bell several questions about the alleged scrap metal scheme involving KCT, and about alleged acts of self-dealing by Mader in connection with RRS invoices to KCT for work on his personal property.  Bell stated, among other things, that:

    a. He was not involved in negotiating the agreements between RRS and KCT. (*Id*. at p. 70, ln. 11-20). This testimony was plainly false, in that Bell's signature appears on the KCT Contract.

    b. Regarding any task order RRS performed pursuant to those contracts, he did not have personal knowledge sufficient to review the task order and tell which, if any, were fraudulent billings. (*Id*. at p. 76, ln. 25 – p. 77, ln. 4; p. 77 ln. 14 – p. 78, ln. 7).

    c. Bell testified that the affidavits he signed in connection with the lawsuits involving KCT, stating that "Razorback colluded with Charles Mader to steal valuable scrap from KCT," were based on information supplied to him by Mitch Thompson (a former employee of RRS who had been terminated for cause), and SA Mickey Rantz. (*Id*. at p. 80, ln. 21 – p. 98, ln. 18.)

---

[1] Mader was named individually in this lawsuit under a theory that he was negligent in failing to maintain the right of way.

d. Specifically, Bell stated that the first person to give him any information about RRS's taking of scrap metal from KCT property and selling it to a scrap yard was Mitch Thompson. (*Id.* at p. 81, ln. 11 – p. 82, ln. 6.) Bell stated that he first learned of this alleged scheme from Thompson in Summer, 2010. (*Id.* at p. 83, ln. 23 – p. 84, ln. 6). Bell testified that Thompson had told him that scrap was taken from KCT property, and that Midwest Scrap and Advance Metal wrote checks for the scrap made payable to Pat Steere. (*Id.* at p. 85, ln. 1 – 17.)

e. Bell also testified that Mitch Thompson had initially offered him the information that RRS employees were selling scrap metal "stolen" from KCT, to curry favor with him and convince him "not to fight him on unemployment and to give him a good reference." (*Id.* at p. 84, ln. 11-24). Thompson, though, would also not have been privy to the KCT Contract making waste and debris the property of RRS, and requiring its removal.

f. Bell also testified that Thompson didn't mention anything about RRS providing services directly to Mader in the form of work on his house, of which Bell had no personal knowledge. Instead, Bell stated that

his sole source of information about any work performed on Mader's house was KBI Agent Rantz. (*Id.* at p. 89, ln. 21 – p. 90, ln. 6).

g. Indeed, Bell also testified that, concerning the amount of loss from the alleged scheme set forth in his affidavit, he got that information "from KCT's law firm," and that he had not made any independent effort to verify the numbers, even though he had testified previously and told investigators that he had "taken over all the accounting functions [of RRS] in 2009." (*Id.* at p. 98, ln. 19 – p. 102, ln. 23).

h. Bell admitted that he had signed the affidavit in question at the direction of KCT's attorneys as part of KCT's settlement agreement with RRS (*Id.* at p. 103, ln. 17 – p. 104, ln. 12).  Bell refused, however, to answer any further questions about the terms of that confidential settlement, such as whether he had been released personally in connection with the settlement agreement between RRS and KCT.  (*Id.* at p. 105, ln. 8-23).

i. Bell also admitted that he had provided input, reviewed, and approved the answer filed on behalf of RRS in the lawsuit filed by KCT against RRS. (*Id.* at p. 108, ln. 19 – p. 109, ln. 25).  In that answer,

reviewed and approved by Bell, RRS <u>denies</u> that "[f]or several years beginning in 2007 or before, Defendant Mader and others engaged in a pattern of activity with the common purpose of defrauding and stealing from [KCT] for their own benefit." (*Id.* at p. 110, ln. 4 – p. 111, ln. 14).

j. During this deposition. when counsel for Mader attempted to ask Bell about the details of the settlement between RRS and KCT, including whether Bell had received a personal release in connection with that settlement (to ascertain evidence of Bell's potential bias), Bell's counsel objected and instructed him not to answer the questions based on the confidentiality clause of that settlement agreement. (*Id.* at pp. 104-05).

39.   By the end of August 2014, Mader and KCT had agreed upon the final details of a confidential settlement in the civil case, and executed a written agreement.  The settlement was executed, as KCT had not withdrawn its offer, as KCT indicated it would do if Mader were indicted.   In settling the case, Mader paid a substantial sum of money to KCT.  The civil case was over.

**D. Continuing Delay by Government to Present Indictment, and Death of John Bell.**

40.  From 2012 through 2015, counsel for Midwest Scrap had many conversations with AUSA's Rask and Wamble, during which time the Government made clear its position that Midwest Scrap and those affiliated with Midwest Scrap had to know that the scrap metal purchased from RRS was stolen, in part because of the prices they paid for such scrap metal.  Rask stated to counsel for Midwest Scrap that Midwest Scrap was a target of the ongoing grand jury investigation.

41.  During this time, counsel for Midwest Scrap produced documents to the Government pursuant to grand jury subpoenas, and as noted above, made multiple employees of Midwest Scrap available for interviews by IRS CID agents, and for depositions in KCT'S civil lawsuits.  For example, Midwest Scrap employees Brett Clancy, Jean Gaskey, Letticia Hennon, Sherrie Burgess, and Victor Wells were all interviewed by IRS CID agents during 2012, 2013, and early 2014, some on multiple occasions.

42.  In September 2014, SA Herron advised another member of the prosecution team that "the U.S. Attorney's Office (District of Kansas) is working toward presenting this case to the grand jury in October 2014," and that "no judicial action had occurred" during the reporting period May 29, 2014 through September 10, 2014. (USSS 000007, attached hereto as Ex. E).  During the balance of 2014, there was no judicial action on the investigation of Mader and others.

43.     In February 2015, SA Herron advised SA Aaron Frazier of the Secret Service that the U.S. Attorney's office was still preparing the case for presentation to the grand jury, a little over three years after the search warrant was executed at RRS, and approximately <u>fifteen months</u> after the prosecution team first indicated in status reports that they were ready to go to a grand jury with a request for indictment regarding Mader.

44. Also in February 2015, counsel for Mader, Jason Hans, had multiple discussions with Rask and Wamble.  The prosecution team made clear to Hans that they wanted to hear whatever information Mr. Mader may be able to provide concerning Midwest Scrap as a target of their investigation.

45. For example, in a discussion occurring April 23, 2015, Rask and Wamble informed Hans that they were interested in having Mader provide "substantial assistance" by "testifying as to his part in the conspiracy," particularly as it related to Midwest Scrap and its owner, Kenny Burgess.  Rask and Wamble had a theory that Razorback had a "cut rate price arrangement" for stolen scrap rail with Midwest Scrap, and that Midwest Scrap had been "willfully blind" as to whether the scrap was stolen.  They believed Mader could provide them with assistance on this topic.  Counsel for the Government stated that if they were continuing to "make progress" with Mader, they would continue to delay the filing of an indictment.

46.  On May 29, 2015, John Bell passed away at Providence Medical Center in Kansas City, Kansas.  As such, Mader will have no chance to confront or cross-examine Bell, who was the Government's principal informant, and who participated in numerous recorded conversations with Mr. Mader.

47.  Even after Bell's death, in September and October 2015, counsel for the government continued to express interest to Hans in having Mader provide "substantial assistance" in their investigation and possible prosecution of Midwest Scrap, stating that they could recommend a sentence reduction if Mader gave information that delivered a prosecution of Midwest Scrap on a "silver platter."

48.  On July 6, 2016, approximately five and a half years after the Government began its investigation, and four and half years after it executed search warrants in relation to the investigation, the grand jury returned an indictment in this case, charging Mader and other employees of RRS with fraud in relation to RRS's dealings with KCT.  The allegations of the indictment are grounded in the same facts which were the foundation for KCT's lawsuits against RRS, Mader and others.  Neither Midwest Scrap nor any of its employees were charged in the indictment.

## II.  Legal Standard

Claims for preindictment delay receive limited protection under the Due Process Clause of the Fifth Amendment.  *United States v.*

*Johnson*, 120 F.3d 1107, 1110 (10th Cir. 1997). "Preindictment delay is not a violation of the Due Process Clause unless the defendant shows both that the delay caused actual prejudice and that the government delayed purposefully to gain a tactical advantage." *Id*. "The burden of proof of making this showing is on the defendant." *United States v. Engstrom*, 965 F.2d 836, 839 (10th Cir. 1992); *Perez v. Sullivan*, 793 F.2d 249 (10th Cir. 1986). "Vague and conclusory allegations of prejudice resulting from the passage of time and the absence of witnesses are insufficient to constitute a showing of actual prejudice. Defendant[s] must show definite and not speculative prejudice, and in what specific manner missing witnesses would have aided the defense." *United States v. Trammell*, 133 F.3d 1343, 1351 (10th Cir. 1998).

The Tenth Circuit has described the Court's task on claims of preindictment delay as follows:

> The Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. Judges are not free, in defining due process, to impose on law enforcement officials our personal and private notions of fairness and to disregard the limits that bind judges in their judicial function. [The Court's] task is more circumscribed. [The Court is] to determine only whether the actions complained of here, compelling [defendants] to stand trial after the Government delayed indictment to investigate further violates those fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency.

*United States v. Revada*, 574 F.2d 1047, 1048-49 (10th Cir. 1978).

The United States Supreme Court has made clear, however, that deliberate delay for tactical advantage is not the only cause of pre-indictment delay that may violate due process. The Court refused to predict "in the abstract the circumstances in which preaccusation delay would require dismissing prosecutions." *United States v. Lovasco*, 431 U.S. 783, 796, 97 S.Ct. 2044, 2052 (1977). The Court's statements "strongly indicate that the Supreme Court is willing to find delay unconstitutional when caused by reasons less invidious than deliberate tactical 'gamesmanship' by the prosecution.'" *United States v. Richburg*, 478 F.Supp. 535, 542 (M.D. Tenn. 1979) (granting in part Defendants' motion to dismiss indictment for preindictment delay.) One such instance is where there is a showing of "prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution, suggesting there existed an appreciable risk that delay would impair the ability to mount an effective defense." *Lovasco*, 431 U.S. at 795, n. 17.

## III. Argument

The Government's five-and-a-half-year delay in seeking an indictment against Mader actually prejudiced Mader, and was the result of either a deliberate delay to gain a tactical advantage over him, or a reckless disregard of circumstances suggesting there existed an appreciable risk that delay may impair Mader's ability to mount an effective defense. The Government appears to have

purposefully delayed the indictment, to take advantage of discovery being conducted in parallel civil proceedings being pursued by KCT; to induce Mader to provide information concerning Midwest Scrap; and to gather information from various other sources to justify including either Midwest Scrap or certain of its employees or principals as defendant co-conspirators in the indictment (which ultimately never occurred). Because of the delay, Mader won't be able to call Bell to testify about his knowledge of Mader's unofficial ownership in RRS, or confront him concerning his many accusatory statements in the recorded conversations, most of which were contravened by Bell himself in depositions taken before his death. Accordingly, the indictment against Mader should be dismissed.

### A. Actual Prejudice

As a centerpiece of its case against Mader, the Government intends to introduce into evidence the recordings of one-on-one meetings between John Bell and Mader, occurring March 11, 2011; March 17, 2011; March 24, 2011; April 5, 2011, and May 7, 2011. The recordings contain many statements by Bell which directly accuse Mader of participating in criminal conduct. When Bell died on May 29, 2015, Mader was left without any ability to confront Bell or cross-examine him concerning those out-of-court, unsworn statements, which constitutes actual prejudice to Mader. Mader will also be unable to call Bell to testify concerning his

knowledge of many key facts, including Mader's partial ownership of RRS, and the agreement that he receive in-kind distributions of labor and materials on his personal properties.

It is well-settled that the Sixth Amendment's Confrontation Clause guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right… to be confronted with witnesses against him." U.S. Const. Amend. VI; *United States v. Ibarra-Diaz*, 805 F.3d 908, 917 (10th Cir. 2015). Moreover, courts have held that "[w]itness deaths alone may meet the required showing of prejudice needed to prove a violation of due process for delay of an indictment." *See, e.g., United States v. Sabbath*, 990 F.Supp. 1007, 1014 (N.D. Ill. 1998) (dismissing indictment for preindictment delay), citing *United States v. Doerr*, 886 F.2d 944, 964 (7th Cir. 1989). Here, Bell is not available to testify, and was not subject to cross-examination concerning his testimonial statements made during his confidential recordings of Mader.

There is evidence that Bell was very involved in the formation of the KCT Contract with RRS, particularly given that his signature, as President of RRS, appears on the initial contract. It would also be critically important for Mader to confront Bell with the fact that the initial contract was negotiated on behalf of KCT by Bill Somervell, the then-president of KCT, and not by Charles Mader. Such admissions by Bell before a jury would have significant impact, because the original KCT bid package and

agreement with RRS provide that "[a]ll material generated by the demolition bid terms <u>shall become the property of the Contractor</u>, and shall be properly and legally disposed of," (KCT_001_1695), and that "the Contractor shall, as directed by the Engineer, remove from the KCT's property, without expense to the KCT, all … rubbish and waste materials resulting from the contract operations…" (KCT_001_1567).

There will be evidence and testimony at trial that the scrap rails recovered from the Blue Valley Line and other properties were long unused, did not meet modern engineering specifications, and that they were not capable of being reused in another setting. In sum, they were rubbish and waste material. These clauses in the KCT Contract therefore permitted RRS to keep whatever value they could derive from removed debris, to assist KCT in avoiding overtime, expensive equipment rental, costly removal and transportation costs, and to comply with FRA regulations, which require a railroad right of way to be clear of any debris which could impair safety or operations. If Mader is unable to confront Bell with such information to impeach his unsworn, accusatory out-of-court statements made in the recordings either expressly stating or implying that the rail was "stolen," then Mader will be prejudiced.

Moreover, there is testimony and evidence from Bell's two depositions which show that Mader will be greatly prejudiced

because he is unable to confront Bell with evidence contradicting his various accusatory statements from the recordings about "stolen" scrap rail and KCT task orders. For example, despite Bell claiming that Mader had no ownership interest in RRS, in Bell's deposition testimony, he had no adequate explanation for the fact that RRS's accounting reports show meticulously kept records of in-kind distributions to Mader as a 30 percent owner in the company, and that Bell had been copied on communications concerning RRS distributions to Mader. There will likely be testimony at trial from other witnesses, such as Ed McIntosh, that it was agreed among Bell, McIntosh, and Steere that Mader would have a thirty percent interest in RRS from its inception. If Mader could have confronted Bell with these records and the statements of other witnesses at trial, the jury could better adjudge for itself the credibility of Bell's unsworn, out-of-court statements, and perhaps hear admissions from him providing an alternative explanation for the work done at Mader's home by RRS employees.

Bell also testified, when asked "who would have been directing [RRS employees] as to what [KCT] task order to report their time under when they were actually doing work for Mr. Mader," that it was "Pat [Steere], Chad Janeczko, or Justin [Drescher]." (*Id.* at 111, ln. 3-19). Bell did <u>not</u> implicate Mader in the task order billing scheme in this testimony, and Mader specifically denies that he knew of such activity at the time it may have been

happening. This testimony would have bolstered Mader's position at trial that the work performed on his personal properties were a form of distribution from RRS, and that he was unaware of any efforts by others at the company to collect revenue from such work via task orders submitted to KCT.  Now, Mader will not be able to elicit this testimony from Bell at trial, due to his death.

Also, Bell testified at his deposition that that he had no first-hand knowledge concerning any alleged "theft" of scrap rail, but rather that he had been told about it by a terminated RRS employee named Mitch Thompson, who supplied this information as a means of currying favor, to ensure that RRS didn't challenge him on his claim for unemployment compensation.  (7/18/2014 Deposition of John Bell at pp. 81-85).

There is also evidence that Bell would admit, if cross-examined, that he had no personal knowledge that RRS provided services directly to Mader in the form of work on his house, but rather that his sole source of information on this topic was KBI Agent Rantz.  (7/18/2014 Deposition of John Bell, at p. 89-90, attached hereto as Ex. I).  This would be an important topic of cross examination, to rebut Bell's unsworn statements in the recordings that RRS workers provided work at Mader's house which was "charged to Kansas City Terminal."

Also, Mader will be unable to confront Bell with RRS's Answer filed in the lawsuit by KCT, which was reviewed and approved by

29

Bell, in which RRS <u>denied</u> that "[f]or several years beginning in 2007 or before, Defendant Mader and others engaged in a pattern of activity with the common purpose of defrauding and stealing from [KCT] for their own benefit." (7/18/2014 Deposition of John Bell, at p. 110, attached hereto as Ex. I). It would be critically important to confront Bell before the jury with this fact to show that Bell is not credible, as he changes his story when it suits him to do so – but his absence makes this impossible. Had the Government acted with reasonable dispatch and indicted Mader in 2013 when it stated it was prepared to do so – well more than a year before Bell's death – such prejudice could have been prevented.

And finally, Mader will not be able to cross-examine Bell concerning his discussions and "plans" with his KBI and IRS handlers leading up to the recorded meetings with Mader.  KBI reports of these meetings show Bell was "instructed to ask Mader to start giving him a 'kickback' on the money that is obtained through the illegal activities associated with Razorback and KCT" (Reports 001287), and that his handlers coached him how to do so. This opportunity is now lost, causing Mader actual prejudice.

**B. Purposeful Delay to Gain Tactical Advantage, Or Reckless Disregard of Circumstances.**

The discovery in this case reveals that SA Herron and the prosecution team thoroughly outlined what they believed to be the

gravamen of the scheme ultimately charged in the indictment when they submitted affidavits in support of the search warrants executed on February 1st and 2nd, 2012. (Reports 002616 – 002641, attached hereto as Ex. F). Then, approximately nineteen months after the execution of the search warrants, reports reflect that the Government was drafting an indictment request for Mader in November 2013, and that there were plans to present the case to the Grand Jury in December 2013. (USSS 000012-000015, attached hereto as Ex. E). The Government also revealed in status reports that it was prepared to present the case to the Grand Jury in October 2014, but again did not do so.

This begs the question: why the considerable delay? There appears from the evidence to be three reasons for the Government's dilatory delay in returning charges in this matter.

First, as early as January 2013, it was clear that the Government and private counsel for KCT collaborated in sharing documents and information concerning their parallel investigations. In January 2013, after "many months of working jointly and cooperatively with the United States Attorney's Office for the District of Kansas" on the language of a protective order, the Government gave KCT's private attorneys copies of the documents it had seized from RRS. KCT's attorneys then used those documents to formulate its case theories in lawsuits against RRS, Mader and others, to draft amended pleadings, and to confront witnesses in discovery

depositions which ultimately ended up in the hands of the Government.

Then, on July 30, 2013, shortly after KCT's deposition of John Bell, members of the prosecution team had a meeting with counsel for KCT, to discuss spreadsheets she had created "detailing the loss Kansas City Terminal has suffered" because of the alleged scheme between Mader and employees of RRS. Counsel provided copies of the spreadsheets to the prosecution team, and described the total loss calculation to exceed $2,400,000.

Later, in November 2013, while members of the prosecution team announced that an "indictment request is being drafted … for Charles Mader," and that the case would be presented to the Grand Jury in December 2013, lead counsel for the Government also noted in a report that the KCT "was currently involved in a civil suit against Charles Mader for losses to their company attributed to Mader as a result of the rail scrap scheme." Later, in April 2014, upon information and belief, the prosecution team requested additional documents from counsel for KCT, and likely received them, given that the Government discovery files contain over a thousand pages of transcripts of interviews of various witnesses, and audio recordings of such interviews, conducted by counsel and internal auditors for KCT. (Interviews 000001 – Interviews 001024).

All these facts strongly suggest that one reason for the Government's delay was to gain a tactical advantage over Mader and the other defendants in this matter by monitoring the parallel civil cases and capitalizing upon whatever discovery was being conducted in those matters.

It also appears from the evidence that the Government's delay in presenting an indictment of Mader to the Grand Jury was directly related to its desire to include, as defendant co-conspirators, either Midwest Scrap, or certain key employees or principals of Midwest Scrap. As described in greater detail above, during 2012, 2013, and early 2014, the Government pursued an active and aggressive investigation of Midwest Scrap and its employees, using search warrants, grand jury subpoenas, employee interviews with case agents, and negotiations with counsel for Midwest Scrap.  Case agents even proposed, at one point, that an undercover operation occur at Midwest Scrap.  Not coincidentally, it seems, the transcripts of depositions of key Midwest Scrap employees taken by counsel for KCT in February 2014, were obtained by the prosecution team and placed in its discovery file. (Deposition of Kenneth Burgess, IRS_000001 – IRS_000036; Deposition of Nicholas Hayes, IRS_000042 – IRS_000070; Deposition of Letticia Hennon; IRS_000071 – IRS_000102).

Then, in early 2015, the Government began to have contacts with Counsel for Mader, making it clear that they wanted to hear

whatever information Mader may be able to provide concerning Midwest Scrap as an additional target of their investigation, in exchange for a recommendation for sentence reduction after a plea of guilt. Counsel for the Government emphasized that it wanted Mader to admit his part in a conspiracy involving Midwest Scrap and Kenny Burgess, and voiced their theory that RRS had a "cut rate price arrangement" for stolen scrap rail with Midwest Scrap, and that Midwest Scrap had been "willfully blind" concerning whether the scrap rail was stolen. Finally, the Government stated that if they were continuing to "make progress" with Mader, they would forestall the filing of an indictment for a brief period.

When Bell died in late May 2015, it had been four years and three months since the Government's investigation began, three years and three months since the search warrant execution at KCT, and a year-and-a-half since the Government stated in a status report that it was prepared to go to a grand jury to seek an indictment of Mader.

These facts all show that the Government's delay in seeking an indictment of Mader was purposeful, or at best, reckless. At least one reason for the delay was to gain a tactical advantage over Mader, to try to force him to give them information concerning the Government's coveted target, Midwest Scrap. The delay was also calculated to enable the civil litigation to be brought to closure, so the Government might potentially benefit from civil discovery

34

and internal investigations performed by KCT – in which Mader had minimal, or in some cases, no participation – which ultimately became part of the Government's discovery file in this case.  Had the Government indicted Mader when they announced they were ready, in December 2013, Mader would have had the opportunity to confront and cross-examine his chief accuser, John Bell.  Because of the Government's intentional and protracted delay, calculated to gather additional information to hook a "bigger fish," Mader has been deprived of that right to his prejudice in a proceeding with very serious potential consequences.

Since the search warrants were executed in February 2012, Mader's controversy with RRS and KCT has dragged on, robbing him of his ability to hold employment, depleting his savings, and affecting his health. The civil portion of the controversy with KCT – which involved negotiations among many lawyers and parties – was settled with complete releases in October 2014.  It was therefore inexcusable for the Government to delay its pursuit of criminal charges in this matter until after the sudden death in mid-2015 of the central (albeit impeachable) witness who called this matter to the Government's attention in the first instance.

This is a case of more than "ordinary negligence on the part of government representatives." *United States v. Glist*, 594 F.2d 1374, 1378 (10th Cir. 1979).  Instead, this case is like *United States v. Gross*, 165 F.Supp.2d 372, 383-84 (E.D.N.Y. 2001), wherein

the court rejected the government's attempts to categorize the
delay in that case as "investigative delay," stating:

> The Government's investigation in this case commenced
> in February 1992 and the indictment was returned in
> February 1998, ten years after most of the transactions
> at issue occurred and six years after the start of the
> investigation…
>
> A chronology of investigative activity on the case
> was provided by the Government… This chronology
> indicates that in six years, there was Government
> activity in this case for a total of only 94 days. The
> Court notes that during those six years, the
> Government's failure to act was evidenced by large gaps
> of time with no case activity whatsoever…

*Id*. at 384. After citing Defense counsel's testimony regarding
changes of the Government's lead counsel on the case, and her
inability to get the AUSA to "focus on the matter," the Court
finally noted that "Defendants were charged in a criminal
indictment which, though allegedly the result of six years of
investigation, was premised on the same claims which comprised the
previous civil complaints against Defendants, all three of which
were dismissed many years earlier." *Id*. at 385 (emphasis added).
The court dismissed the indictment in its entirety. *Id*.

The Government's delay in Mader's case is similar in nearly
every respect. The Government did not return an indictment in
this case until July 2016, nearly five and a half years after it
commenced its investigation of Mader and others at Bell's urging
in February 2011, and nearly a decade after many of the
transactions at issue in this case began, to include execution of

the service contract (by Bell and Somervell) between RRS and KCT. The investigation in this case is also characterized by numerous long periods of inactivity by the case agents and counsel for the government.   And, even though the indictment was allegedly the culmination of five and a half years of investigation, the charges therein are premised entirely on the same claims which comprised the civil complaints filed against RRS, Mader and others in suits filed by KCT on April 4th and 5th, 2012, and which were dismissed several years before.   Here, as in *Gross*, there is no excuse for the Government's recklessness in delaying the indictment in this matter.

Therefore, given the Government's delay well past the time it took KCT and Mader to resolve their underlying civil dispute, and the substantial actual prejudice to Mader, it can be fairly said that "compelling [Mader] to stand trial after the Government delayed indictment to investigate further violates those fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency." *United States v. Revada*, 574 F.2d 1047, 1048-49 (10th Cir. 1978).

## CONCLUSION

WHEREFORE, for all the foregoing reasons, Defendant Charles Mader respectfully asks this Court to enter an order dismissing

the indictment in this case with prejudice, and for such other and further relief as the Court deems just and proper.

Respectfully submitted,

**JOHNSTON LAW FIRM LLC**

/s/ J. Justin Johnston
J. Justin Johnston  KS #20101
811 Grand Blvd., #101
Kansas City, MO 64106
Tel: (816) 739-4538
Fax: (816) 421-5403
jjj@johnstonlawkc.com
***ATTORNEY FOR DEFENDANT***
 ***CHARLES MADER***

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of June, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system for electronic delivery to all counsel of record.

/s/ J. Justin Johnston
***Attorney for Defendant***
